No. 28,735.

GRACE DILLON GIACOMINI et al., *Appellants,* v. ORSINO GIACOMINI, LAURENCE LALLEMENT, THE DE COURSEY CREAM COMPANY et al., *Appellees.*

(280 Pac. 916.)

Opinion filed October 5, 1929.

*Chester I. Long, J. D. Houston, Austin M. Cowan, Claude I. Depew, James G. Norton, W. E. Stanley,* all of Wichita, and *Howard L. Jamison,* of Kansas City, Mo., for the appellants.

*Lee Bond,* of Leavenworth, *E. S. McAnany,* of Kansas City, *R. R. Vermilion, Earle W. Evans, Joseph G. Carey, W. F. Lilleston, Robert C. Foulston* and *George Siefkin,* all of Wichita, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: Grace Dillon Giacomini, for herself and as next friend of her minor children, brought this action against her father-in-law, Orsino Giacomini, and Italo Giacomini, Hugo Batiste Giacomini, Laurence Lallement, and the De Coursey Cream Company, to restrain the defendants from voting or transferring certain shares of stock in the De Coursey Cream Company, and to require the assignment and transfer of the stock to plaintiffs, and also to recover a judgment against the defendants for $60,788 with the accumulated interest thereon of $8,500. The defendants answered with a general denial and added averments as to the purchase of the creamery by Orsino for himself and his son, Romeo, the deceased husband of plaintiff, and for his two remaining sons, Italo and Hugo, as well as for his nephew, Laurence Lallement, and the De Courseys. He set forth the organization of a corporation which took over the business of the company, the issue and distribution of the shares of stock among the parties, including the issue of 150 shares to Romeo Giacomini in his lifetime, and by his authority and acquiescence, and also the payment of the shares made by all except Romeo; that Romeo had made a will which was probated in Leavenworth county with the knowledge and consent of the plaintiff, Grace Dillon Giacomini, and that she participated in the proceedings; that she was paid a valuable, fair and just consideration for the shares of stock, which belonged to her husband, and that she had instituted a suit by which she ratified a sale of the stock, and so estopped her to question or to contest the jurisdiction of the probate court to probate the will. A reply was filed by plaintiffs denying in detail the averments of the answer, with some explanations in support of the denials. The case was submitted to the court without a jury upon a vast volume of testimony, and the following is a summary of the findings of fact made by the court:

Orsino Giacomini, it was found, was a native of Italy, who came to

Leavenworth county where he accumulated considerable wealth and had raised a family of three sons and one daughter, and also had taken and cared for his nephew, Laurence Lallement, who had lived with the family as one of the sons. Romeo, the deceased husband of the plaintiff, was the eldest and was married to plaintiff in 1916. He had been in ill health for several years and had gone to Colorado for lung trouble in 1914. During the World War Orsino purchased stock in the Schalker Packing Company, and through his acquaintance with army officers was able to secure valuable concessions and contracts at Camp Funston, which made the business very profitable. In the conduct of that business Orsino and his son, Romeo, were particularly active. After the war they sold out their interest in the packing company, and together with the De Coursey brothers purchased the Peerless Cream Company plant, at Wichita, in November, 1919, putting into the business $45,000. Orsino advanced $15,000, and the De Courseys $30,000; $22,500 was the amount which was paid to the trustee in bankruptcy, who sold the plant. The purchase was made by Orsino for the benefit of his three sons and his nephew, Lallement, under an agreement with them that they should repay him for the money advanced. Romeo then moved to Wichita with his family and purchased a residence there. The partnership was named the De Coursey Cream Company, and during November and December, 1919, and the year of 1920, it was operated by the De Courseys and the three sons and nephew of Orsino. The son, Romeo, lived in Wichita only two or three months when he became ill again, and in January, 1920, went to Arizona for his health, accompanied by his father, Orsino. Shortly afterwards the wife and children of Romeo followed and lived with him in Arizona until his death on February 24, 1921. A few days before his death he made a will, which was prepared by Orsino, in which all of his property was given to his wife, and named Orsino as executor of the will. After Romeo's death the widow and children returned to Wichita and lived there until sometime in 1923. Orsino had always acted as the head of the family, had looked after the property of all his children. He had the will of Romeo probated in Leavenworth county and the widow of Romeo consulted with him about business affairs, leaving almost everything to his judgment, and when the estate was closed the property of Romeo was all turned over to the widow according to the provisions of the will. When the Peerless Cream Company plant was purchased it was the intention to incorporate the company, and in September, 1920, appli-

cation for a charter was prepared and sent out to Romeo in Arizona, where he signed it, and in which it was set forth that Romeo was to have 150 shares of stock in the corporation. After the estate was closed and the plaintiff had received all the property of the estate, she still continued to advise with Orsino, who the court finds acted in the utmost good faith in looking after her affairs. Plaintiff wished to sell the 150 shares of stock in the company, and after some negotiations Orsino purchased the stock and paid her therefor the sum of $20,000 or $133.33 per share.

The contention of plaintiff that Romeo, her husband, was entitled to more than 150 shares of stock was rejected by the court. It found that the 150 shares was all of the stock of the corporation that he was entitled to, and that when it was formed stock was issued to Giacomini's other two boys and to his nephew. The sum paid plaintiff for the stock was a fair and reasonable price therefor. When Romeo and his father entered into possession of the packing company the money was furnished by Orsino. The four Giacomini boys, including the nephew, relied upon Orsino, and the De Courseys always consulted him. It was understood and agreed between Orsino and the four boys that Orsino should determine and apportion what interest each of the boys should have. When the corporation was organized 150 shares were issued to Romeo and held for him by Orsino, 184 shares of stock were issued to Hugo for the benefit of himself and Italo and Lallement, which were also held by Orsino until it was paid for by the boys, and the boys now own these shares of stock. The will was found to be genuine, duly executed and attested by the witnesses at the request of Romeo, and that alterations in the will were made before the signing and attestation. When it was presented for probate in Leavenworth county the plaintiff appeared in probate court, took part in and encouraged the proceedings, and after assuming and electing to be the sole devisee, voluntarily accepted from Orsino on an accounting $20,000 worth of property of her deceased husband, and later, claiming to be such devisee and legatee, she sued Orsino in the circuit court of Jackson county, knowing all about the contents of the will and the place of domicile of her husband. Orsino was not guilty of any fraud or wrongdoing in reference to the will or the probate thereof, and reaped no benefit therefrom, and knew that at all times he had acted in good faith in the belief that the will was valid and that the probate court of Leavenworth county had juris-

diction to probate the will and administer the estate. In addition to the $14,000 of life insurance received by plaintiff, $2,000 of which was payable to Romeo's mother, who waived it in the interest of plaintiff, plaintiff received without complaint the $20,000 accounted for by Orsino, received also $20,000 for the 150 shares of stock, received also some $6,000 in dividends on the stock, and also monthly payments of interest from time to time aggregating $60,000 or more, and that before and after the death of Romeo she insisted that Orsino should administer the estate. After the accounting and the receipt of the $20,000 thereon, the certificate for 150 shares was still in the possession of Orsino. At that time plaintiff refused to allow Orsino to make certain deductions of $45 per share, but said she would take 50 shares of the stock and allow a deduction of only $45 and that Orsino would have to keep the other 100 shares, which being in the hands of Orsino should be divided equally, to which he assented. After the accounting and the receipt of $20,000 thereon, she refused to carry out the understanding as to the 150 shares of stock, and no part of the 100 shares was ever paid for by Romeo or anyone in behalf of them or either of· them. Orsino, the De Courseys, and the other defendants acted in good faith in the transactions of the cream company, there was no fraud or unfair dealing in the premises, and plaintiff was not misled or defrauded, and none of them had told her that the stock was not worth more than par, or that no dividends would be paid in 1923, or that the prospects of the company were poor or not in good financial condition, and no misrepresentations made to her as to the conditions of the company, or as to the value of the stock at Kansas City. It was found that Orsino honestly accounted to plaintiff for all dividends or moneys or properties belonging to Romeo or the estate and duly made monthly payments to her during the administration of the estate. Orsino, in the exercise of the utmost good faith, relied upon the genuineness of the will, the validity of its execution and probate, and accounted in good faith to plaintiff for the property of the estate. It was found that plaintiff was and is estopped to bring or maintain this action or any of the claims advanced by her; that with full knowledge of the facts she has been guilty of laches in asserting her pretended rights and claims and is barred by the statute of limitations; that Romeo, in his lifetime, knew that there would be and that there was issued in his name and in his possession the 150 shares of stock, and also that 184 shares of stock

were issued to Hugo himself and the other boys, and that any cause of action there may have been in the premises would have accrued in Romeo's lifetime, and therefore the estoppel and bar is involved. In reliance on the understanding of all of the parties as to their interest in the enterprise, Hugo, Italo and Lallement went to Wichita and devoted their time and efforts to the upbuilding and improving of the business, with the acquiescence of Romeo, while he lived, and of the plaintiff at all times, and Orsino had paid out of his own pocket as a result of the illness and death of Romeo, about $2,000, for which he made no charge against his son or his estate, and when Romeo died he had in Leavenworth county goods, property and effects which remained there throughout the period of administration in the probate court. In the formation of the company and the issuance of the stock, payments of dividends were handled without fraud both before and after the death of Romeo. There is a further finding that from a preponderance of the evidence Romeo at the time of his death was a resident of Sedgwick county, but it was not so clearly and conclusively shown as to warrant a finding that the probate of the will of Romeo in Leavenworth county should be set aside. In the income tax returns for the partnership in 1919 it was shown that Romeo was an owner of a four-twelfths interest in the partnership. While Romeo was participating in the partnership he drew as salary from the company $250 per month, and T. H. De Coursey drew a salary of the same amount. After the organization of the corporation, capital stock was fixed at $100,000, consisting of 1,000 shares with a par value of $100 each, and was issued to the partners in proportion to their respective ownership in the partnership business. The certificate for the 150 shares to Romeo was not delivered into his possession at that time, neither was the certificate for the 184 shares made out to Hugo Giacomini, but was retained in the possession of Orsino until sometime in May, 1921. The division of the 184 shares of stock which stood in the name of Hugo was not determined until after the death of Romeo, and when made it was done at the direction and upon the determination of Orsino. It was never intended by Orsino nor by Hugo that he should receive all of the 184 shares. The will of Romeo was never probated in the probate court of Sedgwick county. No guardianship proceedings have ever been had for the minors, and it was finally found that at the institution of this suit and at the present time there are no unpaid debts of the estate of Romeo. Upon the

findings the court concluded that Lallement is the lawful owner and holder of 50 shares, that Hugo was the owner and holder of 84 shares, Orsino is the owner and holder of 50 shares, and that Italo is the lawful owner and holder of 50 shares. The will in question was found to be genuine and valid,. and as to the probate of the will, it is found that while Romeo was a resident of Sedgwick county for a time the probate of the will in Leavenworth county should not be overthrown, and while there was a bare preponderance of the evidence that he resided in Sedgwick county this was deemed insufficient to overcome the presumption and evidence in the case that the probate court of Leavenworth county had jurisdiction, and the probate of the will and the administration of the estate there are found to be valid.

The plaintiff's appeal and the principal questions raised are that certain findings of the court are not supported by the evidence, which is included in an abstract of plaintiff's covering 282 printed pages and a counter abstract of defendants' of 54 pages. The issues in the case are quite well indicated in the preceding summary of the facts obtained from the special findings of the court. We will take up plaintiff's assignments of error substantially in the order they were presented. A number of the findings are challenged as being without support in the evidence, one of which is that Romeo, under whom plaintiff claims, had acquired a one-third interest in The De Coursey Cream Company, and in a settlement with defendants was entitled to that share. The cream company was operated under a partnership arrangement for a brief time, but from the beginning it was the understanding that it would be organized and operated as a corporation as soon as it could be conveniently done. The court, it is said, has found that during the existence of the partnership Romeo was one of the partners, and that Orsino was not a member of the partnership, and that it was specifically agreed that he should not be a member. It appears that the cream company was purchased and taken over on the basis that the De Courseys would own two-thirds of the plant and the Giacóminis the remaining one-third. The negotiations with the De Courseys touching the purchase was carried on largely by Orsino for his three sons and his nephew, and he advanced the money for the Giacominis, amounting to $15,000. It was done with the understanding that the Giacomini boys, as they were termed, would each have an interest in the

company, and that they would reimburse Orsino for the shares assigned to each of them. While Romeo had assisted Orsino, his father, in carrying on the business at Camp Funston, in which considerable money was made, the testimony tends to show that Romeo never acquired a one-third interest as claimed by plaintiffs, but that when the incorporation of the business was effected he was assigned a certain number of shares agreed upon, viz., 150, and appeared to be satisfied with the allotment made. He did not furnish any part of the $15,000 advanced by his father in the purchase and development of the plant, nor did he ever refund or pay his father any part of the money advanced for the Giacomini interest in the company. There can be little question as to the shares of stock allotted to and actually owned by Romeo. The application for a charter and the charter itself recited that he had 150 shares and the remaining shares, 184, represented the Giacomini interest. They were issued in the name of Hugo, to be later distributed among the Giacomini members when each of them should pay Orsino the amounts which he had advanced for them. It appears that Orsino, the father, had always looked after the interests of the four boys and manifested a desire to start them in business. He not only advanced the money towards that end, but advised and assisted them in starting the enterprise and promoting the business, and on the whole disclosed a great desire to aid in furthering the interest and success of Romeo and the other boys, and actually contributed much towards it.

There is conflict in the evidence, and the credibility of some of the witnesses upon whose evidence the court relied is assailed by plaintiff, but credibility of witnesses was a question for that court. There is an abundance of evidence to support the findings of the court as to the share actually owned by Romeo, and to negative the theory that he held one-third of the stock of the company, either individually or in part as trustee for the other members of the Giacomini family. Romeo knew that the 150 shares were allotted to him, and also of the disposition that was to be made of the remaining 184 shares, and the evidence justified the court in holding that if any cause of action ever existed in favor of Romeo upon this branch of the case, it accrued in his lifetime and that plaintiff's action was barred by the statute of limitations. The general rule is that the statute of limitations which had commenced to run against a cause of action in the lifetime of a party is not suspended by his death

but continues to run until the cause of action or demand is barred. (*Green v. Goble*, 7 Kan. 297; *Davis v. Threlkeld*, 58 Kan. 763, 51 Pac. 226; 37 C. J. 1028.) It is not apparent, however, that a cause of action ever arose against defendants in favor of Romeo or of plaintiffs.

Another ground of complaint is that Orsino was guilty of fraud in the purchase of the 150 shares from Grace Dillon Giacomini, the widow of Romeo, in that the stock was worth more than was paid for it. The evidence relating to this subject has been carefully read, and while she trusted Orsino and frequently acted upon his advice in business matters, we fail to find anything approaching fraud in the transaction. The court upon the whole of the evidence has found that the price paid to her, $20,000, being a little more than $133 a share, was a fair and reasonable price for the stock. We conclude from the evidence that the finding was justified.

It is further claimed that testimony on the points mentioned as to communications and transactions with the deceased was improperly received. It appears, however, that the court recognized fully the rule affecting the admission of such communications and transactions and when objections were specifically made and brought to the attention of the court they were sustained. It may be that some evidence crept in that was subject to that objection, but if so it was inadvertently done and the manifest purpose of the court was to exclude and give no consideration to that kind of testimony. The case was tried without a jury, and the admission of incompetent testimony under those circumstances is not a ground of reversal unless it appears affirmatively that the objectionable evidence affected the result. (*McCready v. Crane*, 74 Kan. 710, 88 Pac. 748; *Collins v. Hayden*, 104 Kan. 351, 179 Pac. 308.) It may be assumed that the court gave no force to testimony recognized to be inadmissible and based his findings on that which is competent. From the record it does not appear that such testimony as might be regarded as objectionable could have affected the result.

The validity of the will made by Romeo and the probate of it in Leavenworth county are challenged by plaintiffs. On January 29, 1920, and shortly after the purchase of the cream plant, Romeo became seriously ill with tuberculosis and left for Arizona, accompanied by his father, hoping to obtain an improvement in his condition by the change of climate. No permanent relief was gained by the change and he remained there until February 24, 1921, when

he died. Not long before his death he requested that his father, Orsino, visit him and concluded that he had only a short time to live. A will was prepared which was written by Orsino. This will gave all the property of Romeo to his wife, Grace Dillon Giacomini. There is testimony that it was written with her knowledge and was read by her before it was signed. After providing for payment of debts and funeral expenses, it was provided that, "I leave and bequeath to my beloved wife, Grace Giacomini, any and all of my possessions, real or personal, wherever situate." It contained a paragraph to the effect that the testator requested the appointment of ——— executor, without bond, leaving a blank for the name of the executor. When Grace Giacomini noticed the blank she inquired about it, and Orsino suggested that she should act in that capacity, but she was unwilling to do so and asked Orsino to act as executor, and after some discussion he agreed to do so, took out his fountain pen and with a different ink filled the blank by inserting his own name. There is credible testimony that the blank was filled before the will was signed by the testator and the pronoun "he" was inserted in blank left where it was provided that the one named should not be required to give a bond. The name of Romeo was attached to the will and there was a statement in the attesting clause that A. N. Mello and Orsino Giacomini both were present when Romeo Giacomini signed the will, and that both saw him affix his name to the will. Grace was present when the will was attested by the witnesses and manifestly knew the nature of the document. Mello, in a deposition filed in this case, stated in effect that he did not see Romeo sign the will and that blanks were not filled when he signed the attestation. The court, upon what appears to be sufficient testimony, held the will to have been duly executed in the presence of witnesses and that the alterations in the will were made before the signing or attestation of it. Much is said as to the changes and as to the genuineness of the will, especially in respect to the filling of the blanks making Orsino the executor and its consequent illegality. The widow is in the peculiar position of attacking the will and availing herself of its provisions in which she was made the sole beneficiary. The evidence shows that she participated in the probate of the will and also that she elected to take under it, giving her all the property of the estate, rather than taking under the law, under which the children would have had one-half of the estate. She has accepted from the executor at different times, for a

number of years, large sums of money, the proceeds of the estate administered by the executor, which aggregated about $60,000. She states that she had not learned of the invalidity of the will nor of the invalidity of the proceedings for its probate until long afterwards, but so far as she is concerned, she is hardly in a position to contend that the will is invalid, where she has accepted and still holds the property obtained pursuant to the terms of the will. (*Chaffee v. Kaufman,* 113 Kan. 254, 214 Pac. 618.)

There is a further contention that the will was ineffective because the court which probated it was without jurisdiction. This is based upon a claim that Romeo and his family were residents of Sedgwick county, that the will should have been probated at the place of his residence, and that it was probated in Leavenworth county, where it appears the estate was administered to a final settlement under the directions of that court. Orsino Giacomini and his family, including Romeo, had been residents of Leavenworth county for many years. Romeo had been absent at Camp Funston and had been away in the mountain country for his health at different times. When the cream plant at Wichita was purchased he went there and lived there for two months in a house purchased in Wichita by his father. Then he was taken to Arizona, where he stayed until his death. Some of the evidence tended to show that Romeo was a resident of Sedgwick county, but the probate court of Leavenworth county, in which the proceedings were had, decided upon a showing made that he was a resident of Leavenworth county. Orsino had made and filed an affidavit in the probate court of that county to the effect that the residence of Romeo was in Leavenworth, and there were some grounds for it because of the transient character of his dwelling places, the temporary stays in several places where he went for the benefit of his health and for business purposes, the brief stay at Wichita, the removal to Arizona, doubtless intended at first to be no more than a temporary home, but when he got some relief from his illness in Arizona he stated that if he got well this time, he was going to stay in the desert and make his home down there. Leavenworth had been his fixed place of residence for years, and goods and property of his remained there until after his death. The probate court, which is a court of general jurisdiction in respect to such matters, has determined the question of residence, and that was a matter which the court was competent to decide. If error was com-

mitted it could have been corrected upon appeal or other direct proceedings. No such steps were taken, but the administration of the estate proceeded for a period of years until final settlement was made and there had been a distribution of the estate in accordance with the provisions of the will. Under the law the proceedings in such a case should be brought in the county where the deceased resided at the time of his death, and the actual place of residence may be shown in a proper proceeding where the jurisdiction of the court to administer the estate is involved. (*Ewing v. Mallison,* 65 Kan. 484, 70 Pac. 369.) In the cited case, which involved the question whether one or the other of two probate courts which had assumed jurisdiction to appoint administrators and administer an estate, depending on the residence of the deceased at the time of his death, had jurisdiction, it was decided that the matter of jurisdiction of the court was open to collateral attack. In the later case of *Robinson v. Railway Co.,* 96 Kan. 137, 150 Pac. 636, it was stated that the decision in the Mallison case is against the great weight of judicial opinion, and while it and another case were not overruled, the court, through Justice Mason, stated that: "The fact that they are out of harmony with the prevailing view of the law is a reason for confining their application within the narrowest limits." (p. 143.) The appointment of an executor and the granting of authority to administer an estate are judicial acts, and when in due form are deemed to be *prima facie* regular and valid. It devolves on one attacking the legality of such an adjudication because of nonresidence to prove clearly and conclusively that the court rendering the decision was without jurisdiction. It has been said that—

"Collateral attacks upon judicial proceedings are never favored; and when such attacks are made, unless it is clearly and conclusively made to appear that the court had no jurisdiction, or that it transcended its jurisdiction, the proceedings will not be held to be void, but will be held to be valid." (*Head v. Daniels,* 38 Kan. 1, 15 Pac. 911.)

See, also, *Musick v. Beebe, Adm.,* 17 Kan. 47; *Howbert v. Heyle,* 47 Kan. 58, 27 Pac. 116; *Bradford v. Larkin,* 57 Kan. 90, 45 Pac. 69; *Harvester Co. v. Algie,* 101 Kan. 654, 657, 168 Pac. 876.

In an action to set aside a will which had been probated it was said that when an executor has secured an adjudication probating a will, and has made the necessary proof of probate, he is not required to call witnesses to establish the will, but may rest on the

*prima facie* case made for him by the order of probate, which stands as an epitome of all the executor was obliged to prove. (*Rice v. Munroe,* 108 Kan. 526, 196 Pac. 756.) There was testimony tending to show the residence of the deceased in another county which the court spoke of as a preponderance, but it found that it was not sufficient to overcome the adjudication of the probate court and all that was implied in the decision. Evidently the court held that there was not that clear and conclusive showing required to avoid the *prima facie* case to warrant a decision that there was a lack of jurisdiction in the probate court of Leavenworth county. Assuming that the residence of the deceased was open to inquiry, we think that in view of the circumstances that have been mentioned, the participation of Mrs. Giacomini in the probate of the will and the administration of the estate, down to a final settlement and the receipt of the entire assets of the estate, it cannot be held that the proceedings were void.

Since the will must be held to be genuine and valid, and that the proceeding in probating it is not invalid, it follows that the plaintiff, Grace Dillon Giacomini, was entitled to the entire estate as the will provided. This she has received, and since the children named as plaintiffs never acquired any interest in it or any right to maintain an action against the defendants, this action is not a matter of concern to them. The father, Romeo, evidently gave all the property to their mother upon the belief and theory that she would properly provide and care for them.

Some other objections have been urged as to rulings on the admission of evidence, the incredibility and weakness of some that was received, claimed defects in the steps taken toward the incorporation of the cream company, which was recognized by plaintiff in the claims made by her under the incorporation, alleged inconsistency in the findings of the court, and the refusal of the motion for a new trial. All of these have been carefully examined, but we find no material error in them nor anything in the case warranting a reversal of the judgment.

The judgment is affirmed.