No. 29,654.

PAUL HUYCKE et al., Partners, as THE PAUL HUYCKE LUMBER COMPANY, *Appellants*, v. RACHEL R. KRAMER, as an Individual and as Administratrix of the Estate of Roy Kramer, Deceased, et al., *Appellees*.

(298 Pac. 787.)

42

Opinion filed May 9, 1931.

*James F. Swoyer,* of Oskaloosa, *Edwin A. Austin, John M. Williams* and *Arthur F. Davis,* all of Topeka, for the appellants.

*M. A. Bender,* of Holton, *Oscar Raines, Ralph F. Glenn* and *Ivah Raines Glenn,* all of Topeka, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action to recover a money judgment against Rachel R. Kramer for an indebtedness owed by her father, the late W. J. Grist, of Jefferson county.

Plaintiffs' theory of the action was based on the assumption that Rachel had possessed herself of certain assets of her father's estate at his death and converted them to her own use, and was liable in consequence for his indebtedness to plaintiffs to the extent of the assets she had thus obtained which had belonged to her father.

Plaintiffs alleged that they were partners in the lumber and hardware business at Rock Creek in Jefferson county; that until his death in January, 1928, W. J. Grist, owned and operated a farm of 480 acres in that vicinity; and that plaintiffs had sold to him various goods, wares and merchandise upon an open running account, and that Grist owed plaintiffs the sum of $993.74 therefor.

Plaintiffs further alleged that some time prior to his death Grist and his daughter Rachel formed a conspiracy to defraud his creditors, and to that end he secretly executed to her and to her

husband, Roy Kramer, certain bills of sale and other instruments pretending to convey all his real and personal property, and that no consideration passed to Grist therefor.

It was further alleged that no administration of the estate of W. J. Grist had been instituted by Rachel or anyone else, and that she had announced her intention not to have such estate administered under supervision of the probate court.

Plaintiffs also alleged that on the death of her father, Rachel immediately took possession of the Grist farm and all the personalty and caused sale bills to be printed and published to the effect that all the personal effects on the premises would be sold at public auction on February 17, 1928.

On that date plaintiffs filed this action and obtained from the probate judge a temporary restraining order to prevent the holding of the auction. The order was served forthwith, and Rachel and her husband immediately gave bond to deliver the proceeds into the control of the court and to abide its judgment, and the sale was permitted to proceed.

Later plaintiffs filed an amended petition setting up the facts originally alleged with some further detail. Defendants answered with a general denial, and raised the legal point that plaintiffs could not maintain the action, and alleged that there were other debts of the estate of W. J. Grist than that due the plaintiffs.

Other parties were impleaded in the action, some of whom filed pleadings, but their rights are of no present concern.

A jury was waived and the cause was tried at length. The court made fifty-four findings of fact which cover fifteen printed pages of the abstract, and concluded therefrom that judgment for costs should be rendered in favor of defendants.

Plaintiffs appeal, specifying various errors which will be considered as nearly as practicable in the order of their presentation.

1. Error is assigned on the trial court's holding that the certificates of sale for the milk cows, horses and mules passed good title to the miscellaneous farm chattels which defendant Rachel sold at auction on February 17, 1928, shortly after her father's death. It is quite true that of the particular certificates of sale which were introduced in evidence one covered horses and mules and the other cows and heifers, and neither referred to the farm machinery, poultry and swine. However, as we read the findings, the trial court did not hold that those particular assignments of

sale passed title to the miscellaneous chattels on the Grist farm. Rachel testified that there were other certificates of sale executed to her by her father which had been mislaid or lost. The witness Owens, who appeared to know a good deal about Grist's business during his last years, testified that Grist did not own any farm machinery. Roy Kramer testified that the harrow, cultivator, corn planter and other implements which were sold at the auction belonged to himself and his wife. There were twenty-five items on this list, which included such articles as a lard press, an oiler and a "lot of junk," as well as the miscellaneous farming equipment. These twenty-five items brought $102.10 at the sale—according to our computation of the pertinent part of finding No. 52. There was substantial testimony to show that the cattle were part of a herd which Rachel's father had mortgaged to one Martin to secure a *bona fide* indebtedness, and that she had assumed that mortgage, and that part of the cattle sold at the auction were those mortgaged to Martin and their increase. Other cattle had been purchased by Roy Kramer and taken to the Grist farm. The swine sold at the auction were shown to be the increase of some sow pigs placed on the farm by Roy Kramer. The poultry had been taken to the Grist farm from the Kramer home in Ozawkie. The foregoing is not a complete summary of the evidence touching the ownership of the personal chattels sold at the auction, but it will serve to show that the error assigned on the want of evidence to support the pertinent finding of the court cannot be sustained. The suggestion is made that there was no change of possession to Rachel. The evidence inherent in the circumstances would justify a finding to the contrary, one to the effect that when Rachel acquired the farm and arranged to have her father occupy it for the rest of his life that she was in fact in possession of it and all the personalty thereon, and that the occupancy of W. J. Grist was merely that of Rachel's tenant and agent. He did business in her name, wrote checks in her name or her husband's, and when he needed cash in these transactions "he had to go to Rachel for the money."

2. Error is also assigned on the court's finding that Rachel had acquired good title to the Grist farm of 480 acres. To a reviewing court that finding is apparently so unassailable that we marvel at appellants' contention to the contrary. The farm had been sold in foreclosure to satisfy first and second mortgages amounting to about

$20,000. The time to redeem was running out. Grist's efforts to obtain a new loan to redeem the farm had been unsuccessful, chiefly because he was burdened with $50,000 indebtedness to other creditors. Grist made a deed to Rachel, hoping she could borrow the requisite money to redeem the farm, but that effort was futile. That deed did not convey anything to Rachel. When the time to redeem had expired the Citizens State Bank of Valley Falls became the absolute owner of the farm, having bought it at foreclosure sale to protect its interest as second mortgagee. The bank held title by sheriff's deed. That the bank did not want the farm and was still willing that Grist or his daughter might have it for the amount of money the bank had in it took nothing from the strength of the bank's title. Eventually a plan was devised by which Rachel could acquire the farm. That plan was to get a deed to it from the bank and mortgage the farm on her own responsibility and to scrape together money enough by the sale of her own and her husband's assets to pay the bank. It would serve no purpose to go into details of that transaction. The older Grist had no part in it other than his natural concern to see his daughter get the farm which had once been his but which he had irrevocably lost. There was no place in that transaction where the question of Grist's good or bad faith could have affected it in the slightest degree. If the bank had made Rachel a present of the farm, plaintiffs could not question the validity of her title.

3. Plaintiffs complain because the trial court did not make specific findings on certain evidential matters to which plaintiffs would attach much significance. We think that the fifty-four findings which the court did make were more than sufficient to cover the matters in issue, and to indicate with sufficient clarity the proper judgment to be rendered in the action, as well as to enable a reviewing court to discern with what candor and consideration the trial court did deal with the evidence. That fully satisfied the statutory requirements touching special findings. (*Alexa v. Alexa,* 108 Kan. 38, 193 Pac. 1083; *Diver v. Fourth National Bank,* 132 Kan. 36, 294 Pac. 924.)

In *Phillips v. Okey,* 111 Kan. 732, 207 Pac. 1106, it was said:

"In making findings of fact as required by the civil code, section 297, the trial court is not bound to adopt and follow a categorical outline of questions of fact submitted by the litigants or either of them." (Syl. ¶ 3.)

4. Plaintiffs would make a point out of the fact that W. J. Grist did not comply with the purported terms of the life lease by which he held the farm under a grant from Rachel. We fail to see how that fact concerns these plaintiffs. If Rachel was satisfied with her life tenant's performance or nonperformance, no one else could be heard to complain. Manifestly her chief concern was to provide a home for her father in his old age. Of course, a good talking point against the *bona fides* of the lease from Rachel to her father can be made from Grist's failure to keep up the improvements and pay the taxes and the interest due on the mortgages which Rachel had given on the farm, as he had agreed to do, but such an argument does not compel a conclusion that Rachel converted to her own use any property of her father's estate, and that is the limit of plaintiff's concern with her and her father's business arrangements in this lawsuit.

5. The nearest appellants get to a material point against the correctness of the judgment is in relation to certain specific property which plaintiffs allege that they sold to Grist and which Rachel took charge of and sold at the auction on February 17, 1928. A witness testified that there were four monitors and riding listers purchased from plaintiffs, and that these were on the farm when Grist died. The sale bill indicated that a "1-row monitor" would be offered for sale at the auction, and the clerk's list of what was sold has an item showing that one monitor was sold for $14.80. The list of chattels sold does not indicate the sale of any other monitors and does not show the sale of any riding lister. There was no evidence to show that the "1-row monitor" sold at the sale for $14.80 was one of the four monitors alleged to have been purchased by W. J. Grist from plaintiffs. So an apparently complete answer to this point urged by plaintiffs is that plaintiffs failed in their proof. Moreover, there is no such thing in this state as a general vendor's lien on chattels where the vendor parts with their possession. If such a lien is desired it must be arranged for between vendor and vendee by special contract or chattel mortgage. (*Davison v. Davison,* 125 Kan. 807, 810, 811, 266 Pac. 650.)

6. Error is assigned in permitting Rachel to testify on her own behalf regarding transactions with her deceased father. This testimony had reference to Rachel's promise to her father to pay the debt he owed to one Martin, who had a mortgage on Grist's herd

of milk cows. But that fact was otherwise competently shown, and as there was no jury to be misled by the admission of this technically incompetent evidence, the error was nonprejudicial. (*Heery v. Reed*, 80 Kan. 380, 102 Pac. 846; *Giacomini v. Giacomini*, 128 Kan. 699, 280 Pac. 916.)

7. The other objections to the judgment have been patiently considered, but they are not of sufficient gravity to disturb the judgment and would not justify further discussion. Throughout our review of this record we have been impressed that it is merely a chronicle of disputed facts with which it was the peculiar province of a trial court to deal and one which does not lend itself readily to modification on appeal. Mayhap the plaintiffs would have had better success in their effort to show that Rachel possessed herself of some of her father's chattels if they had caused an administrator to be appointed and had set to work the machinery of the law for the administration of decedents' estates, but even an administrator would have had to show that defendants had obtained possession of W. J. Grist's property and had converted it to their own use before he could have gotten a hold of such assets and reduced them to cash so as to pay the just demands of plaintiffs—a task which might have been no more successful if undertaken by an administrator than it has been without one. At all events no palpable error appears in the record, and the judgment is therefore affirmed.